UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                             :
BLACKBOARD INC.,                                             :
                                          Petitioner,        :        21 Civ. 7165 (LGS)
                        -against-                            :
                                                             :        **OPINION AND ORDER**
INTERNATIONAL BUSINESS MACHINES                              :
CORPORATION,                                                 :
                                          Respondent.        :
                                                             :
------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

        This case arises from an arbitration award issued in a dispute between Petitioner

Blackboard Inc. and Respondent International Business Machines Corporation.  Petitioner moves

to vacate or modify in part, and confirm in part, a May 27, 2021, arbitration award (the "Award")

rendered in favor of Respondent.  Respondent opposes the motion and moves for attorneys' fees

and costs.  For the reasons below, the Petition to vacate or modify the Award is denied, the

Award is confirmed and Respondent's motion for attorneys' fees and costs is denied.

I.      **BACKGROUND**

        A.      **The Agreement**

        The following facts are taken from the sworn declarations of the parties' counsel and

attached exhibits, including the Award, as well as the docket in this case.

        On June 9, 2016, Petitioner and Respondent executed the Master Professional Services

Agreement (the "Agreement").  Under the Agreement, Respondent agreed to:  (1) operate and

manage Petitioner's existing data centers (the "legacy" centers); (2) migrate Petitioner's products

from the legacy centers to the cloud environment and (3) manage Petitioner's new cloud

environment.  The Agreement also stated that third-party Amazon Web Services ("AWS") would provide the cloud platform.

Schedule D to the contract set forth the pricing terms, and Attachment D.1 to Schedule D set forth the dollar amounts associated with those terms.  Under Section 6 of Schedule D, Petitioner agreed to pay Cloud Hosting Licensing Services Fees to AWS at the AWS commercial price, less a discount.  AWS invoiced Respondent for these fees, and Respondent then invoiced Petitioner for the fee amounts.  Under the original contract, if Petitioner's actual monthly AWS fees exceeded the estimates in Attachment D.1, Respondent invoiced Petitioner a "true-up" for the difference.

In late April 2017, the parties signed an amendment to the Agreement ("Amendment 15"), which impacted three sections of the Agreement:  "Section 5:  Management fees," "Section 6:  Cloud hosting and licensing fees (AWS)" and "Section 7.2:  Reasonable equivalency clause (REC)."  On May 31, 2017, the parties signed a further amendment, replacing Attachment D.1 with Attachment D.1-16.  These amendments abandoned the "true-up" process, and Petitioner instead agreed to pay Respondent for its "actual consumption" in the AWS Cloud at AWS commercial prices, less a discount.  Petitioner also agreed to pay Respondent to manage Petitioner's legacy and cloud environments.  The resulting management fees were based on Resource Units and Resource Baselines, which allowed the management fees to be adjusted each month.[1]  If Petitioner consumed more Resource Units than estimated in the Resource Baseline, Petitioner agreed to pay Additional Resource Charges ("ARCs").  If Petitioner consumed fewer

---

[1]  **The Agreement** defines a Resource Unit as "a measurable device, unit of consumption, staffing level, or other resource defined in **Attachment D.l** that is associated with the Services and for which distinct volumes are measured and charging rates or other charging mechanisms apply." (Emphasis in original).

Resource Units than estimated, Respondent agreed to give Petitioner Reduced Resource Credits ("RRCs").

Central to the instant dispute is the Agreement's "Reasonable Equivalency Clause" ("REC"), which provides, in its entirety:

> As Virtual Machine Instances and associated Server Storage GBs are migrated from the Blackboard Legacy Data Center environment to a *reasonable equivalent* architectural configuration from a *technology, capacity and performance* perspective in the Cloud Provider's environment, the sum of the RRCs for such Virtual Machine Instances, associated Server Storage GBs and any other applicable Resource Units in Blackboard's Legacy Data Center environment resulting from such migration shall not be less than the sum of the ARCs for the addition in Cloud Provider's environment of the reasonably equivalent elements (including any charges for Virtual Machine Instances, associated Server Storage GBs, routers, load balancers, and other network resources, along with usage charges) representing such reasonably equivalent architectural configuration (i.e., at a minimum a net zero change in the Charges).  The Parties acknowledge and agree that the additional ARCs and RRCs will apply to additional AWS services selected by Blackboard users (or as Blackboard directs Service Provider).  For the avoidance of doubt, the determination of reasonable equivalency must take into account seasonality, since migrations will often occur during the Summer or between academic terms, when volumes are likely to be lower.

(Emphasis added.)

### B.    Post-Contract Dealings

In March 2017, the parties started working together to measure technical aspects of equivalency under the Agreement.  After Petitioner's VP of Cloud Services left the company in June 2017, Petitioner's finance group began leading the equivalency discussions and argued that equivalency should be based on client experience.  Respondent disagreed, contending that the REC called for a tripartite test to determine equivalency.

In August 2017, Petitioner began withholding reasonable equivalency credits from payments due to Respondent and holding those payments in escrow pending resolution of the dispute.  In calculating the amount to be withheld, Petitioner did not conduct the tripartite test

3

under the REC but instead assumed that the legacy and cloud environments were equivalent. Between January 1, 2018, and June 30, 2019, Respondent invoiced Petitioner $89,001,008.79. Petitioner withheld $26,650,148.37 as reasonable equivalency credits -- all consisting of AWS Cloud Hosting Licensing Fees.[2]

On June 28, 2019, the parties entered into a Settlement Agreement in which the parties agreed to terminate the Agreement effective June 30, 2019.  The Settlement Agreement included a provision that the parties would arbitrate their remaining disputes and set forth the arbitration process.

On September 27, 2019, Petitioner filed its Demand for Arbitration, seeking $41 million, including the $26,650,148 that Petitioner withheld under the REC, and pre- and post-judgment interest.  Respondent counterclaimed for the same $26,650,148 and requested pre- and post-judgment interest.

### C.    The Arbitration and Award

The parties presented their case to a panel of three arbitrators (the "Panel") in March 2021.  According to the Award, the proceeding involved "11 bankers' boxes of exhibits sent to each Panel member; 10 hearing days; 1 oral day of summing-up; and final written briefing from each side."  The Panel heard fifteen live witnesses, watched twelve hours of deposition videos and admitted 278 exhibits into evidence.

On May 27, 2021, the Panel issued a unanimous, sixteen-page opinion denying Petitioner's claims and granting Respondent's counterclaims.  The Award rejected Petitioner's

---

[2]  The Agreement defines the "Cloud Hosting Licensing Services Charges" as "the fixed charges to Blackboard for Service Provider's hosting of various categories of Virtual Machine Instances, Server Storage GBs and other available items in the public cloud environment operated by Amazon Web Services, a Subcontractor to Service Provider."  Petitioner also withheld $3,143,101 as Service Level Agreement credits, which are not at issue here.

argument that it was entitled to withhold payment under the REC on two independent grounds:
(1) the "withholdings consisted entirely of AWS fees, which are not covered under the [REC]"
and (2) "[Petitioner's] cloud environments were not 'reasonably equivalent' to those in the
legacy environments."  To support this conclusion, the Award cites substantial evidence,
including testimony from Randy Lewis, Respondent's pricer, that Petitioner did not know how
much of the legacy environment it wanted to migrate to the cloud, and thus wanted assurance
that its management fees would be about the same in the cloud environment; emails from
Petitioner's VP of Cloud Services reporting internally that Respondent agreed to keep their
management fees equal and then add the AWS Charges; and testimony that Respondent was
comfortable with the REC because the credits were limited to Respondent's management fees,
and allowed only if the legacy and cloud environments were reasonably equivalent in
technology, capacity and performance.

The Panel awarded Respondent $26,650,148 in monetary damages on Counterclaim I, as
well as "pre- and post-judgment interest in accordance with the laws and/or regulation currently
in force by the State of New York for awarding interest in cases of this nature (breach of
contract)."[3]  The Panel did not award prejudgment interest on the escrow interest held by
Petitioner during the periods of escrow and declined to award attorneys' fees and costs.  The
Award also capped total damages at $41,000,000 pursuant to the Damages Cap in the Settlement
Agreement.  This action followed.

---

[3] Petitioner does not challenge the Panel's award of $3,143,101 in monetary damages on
Counterclaim II.

II.   **STANDARD**

Petitions to vacate an arbitration award are governed by the Federal Arbitration Act

("FAA").  *See* 9 U.S.C. §§ 9-12; *see also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576,

582 (2008) ("The [FAA] . . . supplies mechanisms for enforcing arbitration awards:  a judicial

decree confirming an award, an order vacating it, or an order modifying or correcting it.").

The FAA provides that an arbitration award may be vacated in four instances:  "(1) where

the award was procured by corruption, fraud, or undue means; (2) where there was evident

partiality or corruption in the arbitrators . . . ; (3) where the arbitrators were guilty of misconduct

. . . ; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a

mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C.

§ 10(a).  The Second Circuit has "consistently accorded the narrowest of readings to the [FAA's]

authorization to vacate awards pursuant to § 10(a)(4)."  *Beijing Shougang Mining Inv. Co., Ltd.*

*v. Mongolia*, 11 F.4th 144, 161 (2d Cir. 2021).  "[The] analysis under Section 10(a)(4) therefore

focuses on whether the arbitrators had the power, based on the parties' submissions or the

arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that

issue."  *Id.* (internal quotation marks omitted).  Only where an arbitrator "act[s] outside the scope

of his contractually delegated authority -- issuing an award that simply reflect[s] [his] own

notions of [economic] justice rather than draw[ing] its essence from the contract -- may a court

overturn his determination."  *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013)

(internal quotation marks omitted).

An award will not be vacated even where there is "serious error," but only where the

panel "effectively dispense[s] [its] own brand of industrial justice."  *Stolt-Nielsen S.A. v.*

*AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (internal quotation marks omitted).  "A

court's review of an arbitration award is . . . severely limited so as not to frustrate the twin goals

of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."

*United Brotherhood of Carpenters & Joiners of Am. v. Tappan Zee Constructors, LLC*, 804 F.3d

270, 274-75 (2d Cir. 2015).  The party seeking to "vacate an arbitration award has the burden of

proof, and the showing required to avoid confirmation is very high."  *STMicroelectronics, N.V. v.*

*Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 74 (2d Cir. 2011).

## III.   DISCUSSION

Petitioner seeks three alternative forms of relief.  First, Petitioner contends that the

Award of $26,650,148 in direct damages should be vacated because the Panel acted in manifest

disregard of the law by failing to consider post-signing evidence of the parties' intent.  Second,

in the alternative, Petitioner seeks modification and correction of the Award, resulting in a

reduction of $1,782,285 based on a material mistake in the calculation of Respondent's damages.

Third, if any part of the Award is confirmed, Petitioner requests confirmation that the Award is

without pre-decision interest.  For the reasons explained below, Petitioner has failed to carry its

significant burden of showing that any valid basis exists to vacate or modify the Award.

Petitioner's motion to confirm that the Award is without pre-decision interest is granted.

### A.   Confirmation of the Award

A court may vacate an award based on manifest disregard of the law "only if the court

finds both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or

ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and

clearly applicable to the case."  *Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 589 (2d

Cir. 2016) (internal quotation marks omitted).  "[T]he award should be enforced, despite a

court's disagreement with it on the merits, if there is a barely colorable justification for the

outcome reached." *Wallace v. Buttar*, 378 F.3d 182, 190 (2d Cir. 2004) (emphasis in the original). Petitioner has failed to show that the Award was based on a manifest disregard of the law.

Petitioner argues that the Panel disregarded New York law on contract interpretation by finding that the REC was ambiguous and then ignoring extrinsic evidence of the parties' post-signing conduct when interpreting the REC. This argument is incorrect because it mischaracterizes the Award. The Award relied on two independent grounds to find that Petitioner had wrongly withheld payment in reliance on the REC. The first ground was that the REC did not apply, based on a plain reading of unambiguous terms of the contract. This analysis consequently foreclosed consideration of extrinsic evidence and alone was sufficient to support the Award. The second and alternative ground was that, even if the REC did apply, it did not support Petitioner's withholding of payment. The Panel found that a relevant term in the REC is ambiguous and did consider extrinsic evidence. Thus, as further explained below, the Panel did not disregard New York contract law and considered extrinsic evidence when appropriate.

First, the Panel concluded that "the[] withholdings consisted entirely of AWS fees, which are not covered under the [REC]," that the plain language of the contract required Petitioner to pay for "actual consumption" of the AWS Cloud at AWS commercial prices less a discount and that the REC does not cover AWS fees. The Panel heard testimony that apparently assisted in navigating the Agreement. But the testimony was not extrinsic evidence of the parties' intent of the type that would be heard in the case of an ambiguous contract. Specifically, in concluding that the REC does not apply to AWS fees, the Panel heard testimony that "ARCs" and "RRCs," referenced in the REC are defined terms in the Agreement, are used in the Agreement to calculate Respondent's management fees, and are not referenced in the relevant AWS provisions.

The Panel thus relied on the unambiguous terms of the agreement to find that the REC did not authorize Petitioner to withhold payment.

Under New York law, "[i]t is fundamental that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *Nomura Home Equity Loan, Inc., Series 2006–FM2 v. Nomura Credit & Capital, Inc.*, 92 N.E.3d 743, 747 (N.Y. 2017) (internal quotation marks omitted). Extrinsic or parole evidence "is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Donohue v. Cuomo*, 184 N.E.3d 860, 866 (N.Y. 2022) (internal quotation marks omitted). It would have been manifest disregard for the law had the Panel considered -- as Petitioner urges -- the parties' purported, post-signing subjective understanding about the scope of the REC to interpret unambiguous terms in the Agreement.

As an alternative and independent basis to reject Petitioner's withholding of payment, the Award determined in substance that, even if the REC applied to AWS fees, "[Petitioner's] cloud environments were not 'reasonably equivalent' to those in the legacy environments under the tripartite test [technology, capacity and performance] called for under the [Agreement]" and therefore any offset or withholding was improper. The Panel found that the term "reasonably equivalent" is ambiguous as used in the Agreement and weighed the evidence to determine how the term should be interpreted and applied.

Petitioner contends that the Panel manifestly disregarded the law by ignoring evidence that supported the availability of "partial" reasonable equivalency credits under the REC. But this argument is a thinly veiled effort to ask this Court inappropriately to reweigh evidence that was before the Panel. *See Zurich Am. Ins. Co.*, 811 F.3d at 589 (affirming confirmation of arbitration award where it was "arguable that the [petitioner's] evidence could have supported a

contrary conclusion, but that does not show that the [arbitration] panel majority manifestly disregarded the law").  The Panel considered testimony of the parties' respective expert witnesses about how to measure reasonable equivalence and determined that Respondent had the better argument.  The Panel "disagree[d]" with Petitioner's expert, who cited testimony from Petitioner's engineers that "the AWS Cloud environment was 'way, way different'" and "better" than the legacy environment.  The Panel credited Respondent's expert who "applied the contract's tripartite test to each of the five migrated product environments and concluded 'the Legacy and Cloud environments provided to [Petitioner's] clients did not represent reasonably equivalent architectural configurations from a technology, capacity, and performance perspective.'"

Because the Panel offered more than a "barely colorable" justification for its conclusion, the Panel's findings should be confirmed.  *See Wallace*, 378 F.3d at 190.  Accordingly, the motion to vacate the Award is denied.

### B.    Modification of Damages Award

Petitioner seeks modification and correction of the Award, resulting in a reduction of $1,782,285 based on a material mistake in the calculation of Respondent's damages.  This application is denied.

A district court may "modify[] or correct[]" an arbitration award "[w]here there was an evident material miscalculation of figures."  9 U.S.C. § 11(a).  "Modification, however, is generally limited to patently obvious mistakes on the face of the award, such as where the award would provide for double recovery."  *Doscher v. Sea Port Group Sec., LLC*, No. 15 Civ. 384, 2017 WL 6061653, at *6 (S.D.N.Y. Dec. 6, 2017).  As explained below, Petitioner has failed to establish that modification is proper because there is no mistake evident on the face of the

Award.  *See Fellus v. Sterne, Agee & Leach, Inc.*, 783 F. Supp. 2d 612, 619 (S.D.N.Y. 2011)

("Modification based on evident material miscalculation is generally limited to patently obvious

mistakes on the face of the award.").

       **1.**      **Monetary Damages**

      The Panel awarded Respondent $26,650,148 in monetary damages on Counterclaim I --

the same amount that Respondent had requested in its Answering Statement and Counterclaim.

Following the Award, Petitioner requested that the Panel modify these damages under Rule 50 of

the Commercial Arbitration Rules.  The Panel found that modification was inappropriate under

Rule 50, which permits modification only "to correct any clerical, typographical, or

computational errors in the award."  The Panel also found that Petitioner had waived the

argument, stating that "[n]ary a word about the $1,782[,]284.64 matter was discussed or brought

to the Panel's attention until now."

      For similar reasons, modification under 9 U.S.C § 11(a) is inappropriate.  Petitioner does

not argue that the Panel made a mathematical mistake in awarding damages, but rather that the

evidence does not support the amount of damages awarded.  *Doscher*, 2017 WL 6061653, at *6.

("When an award is not the result of some careless or obvious mathematical mistake, but rather

the disposition of a substantive dispute that lay at the heart of the arbitration, modification

pursuant to Section 11(a) is unavailable.") (internal quotation marks omitted).  Also, because the

argument was not timely raised in the arbitration proceedings, it is waived here.  *Bowers v.

Andrew Weir Shipping, Ltd.*, 27 F.3d 800, 808 (2d Cir.1994) (defense "must first be made to the

arbitrator[, and] [n]ot having been so made, the argument was waived"); *1199 SEIU United

Healthcare Workers E. v. Alaris Health at Hamilton Park*, No. 18 Civ. 3336, 2018 WL 9651077,

at *4 (S.D.N.Y. Sept. 4, 2018), *aff'd,* 786 F. App'x 298 (2d Cir. 2019) ("It appears that this

argument was not raised during the arbitration proceedings, however, and it is accordingly waived.").  Modification of the monetary award is denied.

        2.      **Interest**

     The Panel awarded Respondent "pre- and post-judgment interest in accordance with the laws and/or regulations currently in force by the State of New York for awarding interest in cases of this nature (breach of contract)."  Petitioner requests confirmation that the Award is without the pre-decision interest, i.e., that prejudgment interest should be calculated only from the date of the award and no earlier.  The application is granted.

     The law is clear that "prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract."  *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606 (2d Cir. 2003) (quoting *Graham v. James*, 144 F.3d 229, 239 (2d Cir. 1998)); *see also West Virginia v. United States*, 479 U.S. 305, 310 (1987).  "New York law provides for prejudgment interest running from the date of an arbitration award until the entry of final judgment."  *New York Hotel & Motel Trades Council, AFL-CIO v. Life Hotel One LLC*, No. 21 Civ. 5844, 2021 WL 5963973, at *5 (S.D.N.Y. Dec. 16, 2021); *see also In re Arbitration Between Westchester Fire Ins. Co. v. Massamont Ins. Agency Inc.*, 420 F. Supp. 2d 223, 227 (S.D.N.Y. 2005) ("[A]n arbitration award confirmed under the FAA bears interest from the date of the award until judgment confirming it." (citation omitted)).

     Respondent argues that it is entitled to *pre-decision* interest because its Proposed Findings of Facts and Conclusions of Law submitted to the Panel included a proposed calculation of pre-decision interest based on the various dates of the withholdings at issue through May 27, 2021, when the Panel issued the Award, and because Petitioner waived any argument concerning these calculations by not raising them before the Panel.  This argument is

unpersuasive because nowhere in the Award did the Panel confer pre-decision interest.  The plain text of the Award grants "pre- and post-judgment interest in accordance with the laws and/or regulations currently in force by the State of New York for awarding interest in cases of this nature (breach of contract)."  As explained above, New York law provides for prejudgment interest "running from the date of an arbitration award until the entry of final judgment."  *New York Hotel & Motel Trades Council, AFL-CIO*, 2021 WL 5963973, at \*5.  This reading is further supported by the absence of any computation related to pre-decision interest in the Award.  *Cf. Paddington Partners v. Bouchard*, 34 F.3d 1132, 1141 (2d Cir. 1994) (rejecting argument regarding implicit award of pre-decision interest because calculating pre-decision interest requires "a finding of fact regarding the dates from which such interest should run").  Accordingly, Petitioner's motion to confirm that prejudgment interest should be calculated from the date of the Award is granted.

### C.      Attorneys' Fees and Costs

Finally, Respondent seeks attorneys' fees and costs incurred in defending the Petition.  As no applicable statute provides for awarding attorneys' fees and costs, the court may do so only by exercising "its inherent equitable powers to award attorney's fees when opposing counsel acts in bad faith."  *1199 SEIU United Healthcare Workers E.*, 2018 WL 9651077, at \*7.  The record does not support a finding of bad faith.  As the discussion above reflects, Petitioner advanced an arguable, though incorrect, challenge to the Award.  Respondent's motion for attorneys' fees and costs is denied.

## IV.    CONCLUSION

For the foregoing reasons, the Petition to vacate or modify in part the Award is DENIED, and to CONFIRM the Award in part is granted.  The Court confirms the Award in favor of

Respondent and grants judgment in the amount of $26,650,148 on Counterclaim I and

$3,143,101 on Counterclaim II, plus prejudgment interest from the date of the Award -- May 27,

2021 -- through the date of judgment on the Petition, plus post-judgment interest.  Respondent's

motion for attorneys' fees and costs is denied.

The Clerk of Court is respectfully directed to close the case.

Dated:  June 2, 2022
       New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE